UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

BRIAN L. LOGRECO,

                Plaintiff,

v.                                      Case No.  5:07cv-80-Oc-10GRJ

MICHAEL J. ASTRUE, Commissioner of the
Social Security Administration,

                Defendant.

_____/

## ORDER

      Plaintiff appeals from a final decision of the Commissioner of Social Security

("the Commissioner") denying his application for a period of disability and disability

insurance benefits and supplemental security income payments. (Doc. 1.)  The

Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their

respective positions. (Docs. 10 & 11).  For the reasons discussed below, the Court finds

that the Commissioner's decision is due to be **REVERSED** and **REMANDED** under

sentence four of 42 U.S.C. §405(g).

## I. PROCEDURAL HISTORY

      Plaintiff filed an application for a period of disability, disability insurance and

Supplemental Security Income benefits on June 27, 2003, claiming a disability onset

date of February 26, 2001.[1] (R. 15.)  Plaintiff's application was denied initially (R. 37),

and upon reconsideration. (R. 26.)  Thereafter, Plaintiff timely pursued his administrative

remedies available before the Commissioner, and requested a hearing before an

_____

[1] Plaintiff subsequently changed the alleged onset date to January 25, 2002. (R. 111.)

Administrative Law Judge ("ALJ"). (R. 9.)  The ALJ conducted an administrative hearing on March 13, 2006. (R. 333.)  On August 18, 2006, the ALJ issued a decision unfavorable to Plaintiff. (R. 15.)  The Appeals Council denied Plaintiff's request for review on January 5, 2007. (R. 6.)  Plaintiff then timely filed his Complaint challenging the decision of the Commissioner.

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[2] <u>See</u> 42 U.S.C. § 405(g).

[3] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] <u>Foote</u>, 67 F.3d at 1560; *accord,* <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, he is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[12] Fourth, if a claimant's impairments do not prevent him from doing past

---

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

relevant work, he is not disabled.[13] Fifth, if a claimant's impairments (considering his RFC, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide

---

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See Also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (internal citations omitted).

[17] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[18] Phillips v. Barnhart, 357 F.3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1033 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

### III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born on April 17, 1958 and was forty-seven (47) years old when the ALJ issued her decision. (R. 337-338.)  Plaintiff has a high school education and his prior employment has been as a printing press operator. (R. 339.) Plaintiff contends that he has been unable to work since January 25, 2002 when he sustained an injury to his left wrist and was subsequently terminated. (R. 341.) Plaintiff injured his back in 1987, 1996 and 2002. (R. 344-345).

Plaintiff went to the Mt. Clemens General Hospital on December 15, 1994 following a slip on ice at his home, which caused Plaintiff to experience pain in his mid to lower back. (R. 121.) The pain remained and was exacerbated with movement. (*Id.*) Plaintiff was diagnosed with a compression fracture at T-7, after an x-ray of the thoracic

---

[19] See Walker at 1003.

[20] See Wolfe at 1077-78.

[21] See id.

[22] See Doughty at 1278 n.2.

and lumbar spine. (*Id.*) Plaintiff was discharged with pain medication and instructions regarding the compression fracture. (*Id.*)  The radiologic impression revealed intra vertebral disc space narrowing and end plate sclerosis of the L5-S1 level. (R. 123.)

Plaintiff returned to Mr. Clemens General Hospital four days later due to ongoing pain. (R. 119.) An examination revealed the Plaintiff's most palpable pain was centered in the area of the compression fracture at T-7. (*Id.*) Plaintiff was given pain medication and instructed to avoid physical labor for three to four days. (*Id.*)  Four months later on March 17, 1995, Plaintiff returned to Mt. Clemens General Hospital and complained of pain in the mid thoracic region, which worsened with motion. (R. 117.) Plaintiff was examined and had reproducible tenderness in the T-10 and T-12 region of the thoracic back. (*Id.*)  Plaintiff was again discharged with pain medication. (*Id.*)

On March 24, 1995, Plaintiff was involved in a physical altercation and went to Mt. Clemens General Hospital for care.  (R. 113.)  Plaintiff complained of pressure and diminished hearing in the ear, swelling and abrasions to his knees and tenderness to palpitation of the thoracic spine, paravertebrally from T-4 and T-7. (R. 113.)  The diagnostic impression was a contusion of the mid thoracic spine. (R. 114.) However, the radiologic report revealed a normal thoracic spine. (R. 115.)

During the period from April 25, 1999 through January 21, 2003, Plaintiff was treated at Munroe Regional Medical Center for injuries sustained in a four wheeler accident. (R. 144-146.)  Plaintiff suffered a concussion and thoracic sprain. (R. 144-146.)  During the time period Plaintiff was being treated at Munroe Regional Medical Center, Plaintiff was also being treated at Shands Health Care.

In January of 2002, Plaintiff reported that he was moving furniture and heard a

6

"pop" in the area of his back. (R. 206.)  Plaintiff complained of an aching, stiff neck and stated he was experiencing muscle spasms and mid thoracic back pain. (*Id.*)  A physical examination revealed right sided tenderness to palpitation of the paraspinal muscles. (*Id.*)  X-ray films taken at this time suggested a remote injury of the sixth vertebral body. (R. 207.) There was an anterior end-plate remodeling and sclerosis of the sixth thoracic vertebral body related to a remote deformity. (R. 205.)  There were no acute fractures noted and no sublaxation. (*Id.*)  Plaintiff was provided narcotic pain medication and was referred for physical therapy. (*Id.*)

On March 8, 2002, Plaintiff again responded to Shands Health Care and reported having back pain. (R. 204.)  Plaintiff stated that the Vioxx prescription he was taking was helpful but he still had intermittent sharp right-sided back pain. (*Id.*)  Approximately two months later, in May of 2002, Plaintiff returned to Shands and reported doing "fairly well." However, he still presented with chronic back pain. (R. 203.)  Plaintiff stated that he was "feeling depressed" and was experiencing trouble sleeping. (*Id.*)  Plaintiff's depression was diagnosed as "situational" and he was given Zoloft as well as pain medication for this back. (*Id.*)

On July 21, 2002, Plaintiff went to Munroe Regional Medical Center after falling and complained of pain in the chest and back areas. (R. 139.)  An x-ray revealed mild degenerative changes and evidence of the previous compression fracture but no acute abnormality was seen. (R. 142.)  Throughout July and August of 2002, Plaintiff was treated for back pain associated with the compression fracture of the thoracic spine, a back sprain and injured ribs. (R. 129-143.)

In October 2002, Plaintiff was again seen at Shands. (R. 202.)  Plaintiff stated

that his pain was better controlled with Oxycodone but that his depression had increased. (*Id.*)  Plaintiff was diagnosed with depression, his Zoloft prescription was increased and his pain medication refilled. (*Id.*)  On November 5, 2002, Plaintiff returned to the Shands clinic and stated that the increased Zoloft prescription had helped him "tremendously" and he was "...not anywhere near as sad and [wa]s almost back to normal." (R. 201.)  Plaintiff stated that his pain continued to be well controlled with Oxycodone. (*Id.*)  However, Plaintiff then requested that the Soma medication be increased. (*Id.*)  Plaintiff's medications were increased and refilled. (*Id.*)

On December 2, 2002, Plaintiff returned to the Shands clinic "doing well." (R. 200.)  Plaintiff stated that his back pain continued to be well controlled on Oxycodone and that his depression was "feeling much better" on Zoloft. (*Id.*)  Later that same month, on December 30, 2002, he reported low back and mid thoracic pain.  The prescriptions for Zoloft and Oxycodone were refilled. (R. 199.)

On January 21, 2003, Plaintiff returned to Munroe Regional Medical Center for a "thoracic back strain" with complaints of low back pain with tingling in the feet and toes. (R. 153.)  An x-ray revealed narrowing at the L5-S1 disc space with moderate degenerative end plate changes on the lumbar spine and mild degenerative end plate changes on the thoracic spine. (R. 128.) However, no fractures or dislocations were noted. (R. 151.) Plaintiff was provided a prescription medication for treatment. (R. 153.)

On January 28, 2003 and later on February 25, 2003,  Plaintiff returned to Shands and stated that the pain was well controlled on Oxycodone and he was doing well. (R. 197.)  At this time, Plaintiff was referred to an orthopaedist and his pain medication was refilled. (*Id.*)

8

On March 24, 2003 through May 19,2003, Dr. Troy Lowell, an orthopaedist, treated Plaintiff for chronic low back pain. (R. 147-151.)  Plaintiff reported that his back pain fluctuates from mild to severe depending on the task with which he is engaged. (R. 149.) At the time of the examination, Plaintiff did not experience pain radiating down the legs. (*Id.*)  On May 9, 2003, an MRI of the thoracic spine disclosed some degenerative end plate changes at T-6-7. (R. 150.)  The MRI further revealed right sided posterior osteophyte and disc complex at the T-5-6 level but there was no cord abnormality. (*Id.*) Other degenerative changes were seen with the right sided osteophytes and disc complex at T-7-8 but otherwise the thoracic spine was unremarkable. (*Id.*)  Dr. Lowell's impression of the MRI scan was that Plaintiff had mild degenerative disc disease but otherwise he essentially had normal results. (R. 147.)  Plaintiff's problem could not be cured surgically and he was referred to physical therapy. (*Id.*)

On May 28, 2003, August 28, 2003, September 25, 2003, December 15, 2003, January 9, 2004 and February 4, 2004 Plaintiff was seen at Shands Healthcare complaining of low back pain and depression. (R. 188-196.)  Plaintiff continued to be prescribed Oxycodone. (*Id.*)  In July of 2003, the Plaintiff moved in with his mother and reported that his mood improved greatly and he was able to go out shopping with her. (R. 195.)  In August of 2003, Plaintiff reported physical activity that included walking and floating in a neighbor's swimming pool. (R. 194.) On September 25, 2003, he returned to have his medication refilled and stated that he had maintained his physical activity by swimming laps or floating in the pool twenty minutes daily. (R. 192.)  In December, January, and February, Plaintiff reported that he was transferring care from Shands to a clinic in Ocala and that he needed a refill in prescriptions to get him through to his

9

appointment.  (R. 188-190.)

In September 2003, Plaintiff was referred to physical therapy at LifeTime Centers.  An examination revealed: (1) that Plaintiff's right shoulder had lowered significantly; (2) Plaintiff had positional lateral curvature of the thoracic spine to the left and (3) Plaintiff was shifting his weight over to the right. (R. 160.)  Plaintiff also had pronounced paraspinal musculature on the left and minimized musculature on the right thoracic area. (*Id.*)  After being referred to physical therapy, Plaintiff attended one session and was discharged for noncompliance. (R. 155.)

In January of 2004, Plaintiff was referred by the Office of Disability Determinations to Gary Honickman, Ph.D. for a general consultative clinical evaluation regarding his mental status. (R. 172.)  Dr. Honickman found that Plaintiff was oriented in all spheres and his mood and affect were mildly depressed. (*Id.*)  Plaintiff denied any suicidal ideations, hallucinations or significant memory problems. (*Id.*)  Plaintiff's thought processes were organized but depressive in nature.  (*Id.*)  The impression of Dr. Honickman was that Plaintiff had a pain disorder associated with a back injury and psychological factors. (*Id.*) At the date of this evaluation, Plaintiff was taking the following medications:  Zoloft (for depression), Oxycodone (for pain) as well as Baclofen and Acyclovir for other medical conditions. (*Id.*)

On March 4, 2004 and April 15, 2004, Dr. Julio Ugarte evaluated the Plaintiff. (R. 241.)  In March, Plaintiff complained of back pain and stated he had upper back joint pain and a "little" depression. (R. 224.)  Dr. Ugarte's notes disclose a normal musculoskeletal system. (R. 226.)  Dr. Ugarte's assessment was mid back pain and he prescribed Oxycodone and Zanaflex. (*Id.*)  On April 15, 2004, Plaintiff presented with

thoracic back pain with a pain level on a scale of 7 out of 10. (R. 241.) Plaintiff noted that his pain flared up with any activity. (*Id.*)  An examination revealed that Plaintiff's heart was "good" and his lungs were "clear." (*Id.*)  There was no mention of any back examination on April 15, 2004. (*Id.*)  However, in May of 2004, Dr. Ugarte completed a physician's statement stating that Plaintiff had low, mid-back and neck pain and that Plaintiff was unable to work. (R. 240.) Dr. Ugarte's opinion was that Plaintiff's condition was permanent. (*Id.*)

In May 2004, Plaintiff underwent a consultative physical examination by Dr. Nagy Shanawany. (R. 228.)  Plaintiff's functional assessment disclosed a normal range of motion to the cervical spine but decreased range of motion with the lumbar spine. (R. 231.)  Plaintiff was able to bend over and touch his toes and no muscle spasms were noted. (*Id.*)  Plaintiff's straight and seated leg raises were normal as well as his gait. (*Id.*)  Plaintiff could walk without an assistive device, had fine manipulation and normal grip strength. (*Id.*)  There were no motor deficits noted to the upper or lower extremities. (*Id.*)  A mental status evaluation illustrated a normal affect and mood tone. (*Id.*)  Dr. Shanawany's diagnostic impression was back pain. (*Id.*)

Plaintiff was treated at The Center for Spine & Pain Medicine from June 7, 2004 through February 24, 2006. (R. 251-323.)  Dr. Grudem performed an initial examination on June 7, 2004 and he diagnosed Plaintiff with left costo vertebral syndrome, thoracic spine pain, costochondra pain, and with decreased symmetry of the thoracic paraspinal. (R. 318.)  Plaintiff had multiple follow up visits with The Center for Spine & Pain Medicine that same month. (R. 309-323.)  Dr. Grudem ordered an MRI of the spine which was performed on June 28, 2005. (R. 293.)  The MRI revealed the following: 1) a

11

central disc herniation at T3-4; 2) a small right paracentral disc herniation at T5-6; 3) at T-6, a small right paracentral disc herniation with flattening of the ventral sac 4) a bulging annulus/osteophyte complex with a focal small right paracentral disc herniation and 5) a bulging annulus/osteophyte complex with flattening of the ventral thecal sac. (R. 294.) A ventral extradural defect was noted at C 5-6, suggestive of a herniated disc or bulging annulus and a dedicated MRI was recommended to specifically diagnose the problem. (*Id.*)

Plaintiff continued to visit Dr. Grudem and The Center for Spine & Pain Medicine for the next twenty months on a monthly basis up to February of 2006 and was maintained on Hydrocodone, Zanaflex and Celebrex. (R. 251-291.) On September 2, 2005, Plaintiff stated he had recently married and had been driving around a lot. (R. 283.)  That same month, Plaintiff was referred for a psychological evaluation because of Dr. Grudem's concern that Plaintiff was overusing his pain medication, specifically Soma and Oxycodone, and that Plaintiff had some underlying depressional anxiety. (R. 287.)

Plaintiff was referred to and seen by the University of Florida, Department of Clinical & Health Psychology in October 2005. (R. 326.)  During the course of the evaluation, Plaintiff reported that he was having a "good day" with his pain and this was evident by his ability to comfortably shift his legs and arms into various positions throughout the evaluation. (R. 327.)  Throughout the interview, which lasted an hour, Plaintiff did not express the need to stand up in order to alternate positions.  (*Id.*)  Tests results suggested that Plaintiff was experiencing a significant amount of emotional distress that may relate to his experience of pain.  (*Id.*)  The psychologist recommended

12

that Plaintiff attend psychotherapy oriented at introducing new ways of coping with pain, reducing muscle tension and reducing his depressed mood.  (R. 328.)

Plaintiff was contacted several times by the University of Florida, Department of Clinical & Health Psychology in order to schedule an appointment for the recommended psychotherapy.  (R. 324.)   Plaintiff did not respond to the phone calls and it was not until a letter was sent on October 24, 2005 that Plaintiff responded and actually attended a session on October 31, 2005. (*Id.*)  Plaintiff did not attend for the next scheduled appointment, however, when called he stated that he still was interested in therapy.  (*Id.*)  Plaintiff called and requested that he be seen in two hours and he was not accommodated.  (*Id.*)   Plaintiff did not call again nor did he respond to phone calls or to mailed correspondence. (*Id.*)  Plaintiff's file was closed in December of 2005. (*Id.*)

Dr. Grudem, Plaintiff's physician, filed a medical opinion regarding the Plaintiff's ability to do work related activities on July 25, 2005. (R. 242.)  Dr. Grudem found that Plaintiff could carry less than ten pounds and could sit less than two hours. (R. 242.) Plaintiff could sit or stand for 10 to 15 minutes before changing position and must walk around every 15 minutes.  (*Id.*) Plaintiff must shift at will from sitting, standing or walking and may need to lie down at unpredictable intervals.  (*Id.*)  Dr. Grudem stated that Plaintiff must recline very frequently.  (*Id.*)  Dr. Grudem also stated that Plaintiff could never twist, stoop, crouch, or climb ladders (R. 243) and that Plaintiff might be absent from work more than three times a month. (R. 243.)  Dr. Grudem noted medical findings, which supported his opinion, as disc herniation of the neck at C 5-6 and multiple herniations of the thoracic spine and stated that the June 21, 2005 MRI was attached to his medical opinion. (R. 244.)

On December 3, 2003, a non examining physician concluded that Plaintiff could sit, stand, or walk for about six hours in a work day, could lift and carry 20 pounds occasionally and 10 pounds frequently, could only occasionally, climb, stoop, crouch, and frequently balance, kneel and crawl, and should avoid concentrated exposure to hazards. (R. 163-170.)  Furthermore, the non examining physician noted that "the severity of...symptoms is consistent with the medical evidence in the file." (R. 168.)

On January 28, 2004, a non examining provider, Michael H. Zelenka, Ph.D. with the University of Florida, Clinical Psychology Department evaluated Plaintiff. (R. 173.) Dr. Zelenka noted that a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria. (R. 176.) Dr. Zelenka further stated that Plaintiff's disorder was depressive disorder not otherwise specified. (*Id.*) Dr. Zelenka then summarized the evaluation and stated that Plaintiff was being treated for depression secondary to his chronic pain disorder and he found a mild history of depression. (R. 185.)  Plaintiff was able to relate well and his cognitive functioning was within normal limits. (*Id.*)  Plaintiff overall had minimal limitations in functioning due to mental illness. (*Id.*)  Finally, Zelenka opined that the mental health disorder was not severe.  (*Id.*)

At the hearing on March 13, 2006, Plaintiff testified that in 1987 he injured his back and had injured it twice since then. (R. 344.)  Plaintiff described his pain as mid back pain, running from the shoulder to the wrist, lower back pain and occasional shooting pain down his right side. (R. 346.) Plaintiff described a burning pain, which at times escalated to a sharp and pulsating pain. (*Id.*) Plaintiff further described that picking up a gallon of milk could trigger the burning, sharp, pulsing sensation. (*Id.*)

14

Plaintiff stated that his low back pain is different from the mid back pain and during a flare up he is unable to bend over. (R. 347.) The pain radiates down the right buttocks and down the leg. (*Id.*) Plaintiff testified that he attempts to control the pain with medication using a time release formula of Hydrocodone and Tylenol, taken 3 times a day. (R. 348.) According to Plaintiff, the medications produce a drowsy, tired feeling and an inability to concentrate. (*Id.*)

Plaintiff testified that currently, he could not sit or stand for long periods of time and that it was impossible to complete yard work. (R. 343.) Plaintiff stated that he could take care of his personal needs, except at times, he needed help with his socks. (R. 345.) Plaintiff attempts to help with household chores such as washing the dishes but stated he cannot participate much with vacuuming. (R. 346.)

Plaintiff's previous employment was as an offset printer which involved the handling of heavy rolls of paper and lifting 60 pounds on a routine basis. (R. 349) Plaintiff testified that the job required climbing, crawling and standing all day and he would be unable to perform that job under his current conditions. (*Id.*) Plaintiff stated that he would be able to stand for two hours but not consistently. (R. 350.) Plaintiff estimated that he would be able to sit for three hours in a recliner and two to two and a half hours in a straight backed chair. (*Id.*) With prolonged sitting the Plaintiff testified that his muscles tighten and that he must move around, recline or lie down to relieve the problem. (R. 351.) If Plaintiff travels any distance, he stated he must take breaks. (*Id.*) On a normal day, Plaintiff spends more than half of the day reclining or lying down and no longer engages in any hobbies. (R. 352.)

The ALJ determined that Plaintiff did not have a severe impairment with regard to

15

depression. (R. 18.) The ALJ determined that based upon a review of the records Plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. (*Id.*)  Finally, with regard to depression, the ALJ noted that the record does not evidence that the claimant had any repeated episodes of decompensation of extended duration. (*Id.*)

The ALJ did determine that Plaintiff has thoracic myofascial pain syndrome and degenerative disc disease. (*Id.*) The ALJ determined that this was a medically determinable severe impairment. (*Id.*)  The ALJ then stated that, while this impairment was severe, Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4. (*Id.*)

The ALJ then determined that Plaintiff retained the physical residual functional capacity to sit, stand, or walk for about six hours in a work day, that he could lift and carry 20 pounds occasionally and 10 pounds frequently, that he could only occasionally climb, stoop, or crouch, and could frequently balance, kneel and crawl. (R. 20.) Additionally, the ALJ found that Plaintiff should avoid concentrated exposure to hazards. (*Id.*)  The ALJ found that Plaintiff could not perform his past relevant work because his past job required performance of semi-skilled duties at a medium exertional level. (*Id.*) With a residual functioning capacity for a limited range of "light" work, Plaintiff would be unable to perform his past relevant work. (*Id.*)

16

The ALJ applied Rule 202.21 of the Medical-Vocational Guidelines (the "Grids")[23] and found that Plaintiff was not disabled.

The ALJ alternatively found that even if the claimant's non-exertional limitations do not allow him to perform the full range of work activities, based upon the testimony of a vocational expert, Dr. William Summit, the Plaintiff is not disabled because there are a significant number of jobs in the national economy which the Plaintiff could perform.

## IV.  DISCUSSION

The Plaintiff advances the following five arguments in support of his request for reversal and remand of the ALJ's decision. First, the Plaintiff argues that the ALJ erred by finding that Plaintiff's depression was not a severe impairment. Second, Plaintiff argues that the ALJ erred by rejecting the opinions of Drs. Ugarte and Grudem, both of whom were treating physicians. Third, the Plaintiff contends that the ALJ improperly rejected his credibility. Fourth, Plaintiff contends that the ALJ ignored the requirements of SSR 96-8P when evaluating Plaintiff's RFC. Lastly, Plaintiff contends that the ALJ erred at step 5 of the sequential analysis because the hypothetical posed to the vocational expert was inadequate.

Because the Court determines that the ALJ erred with regard to the rejection of the opinions of Dr. Grudem, a treating physician - an error which would materially effect the ALJ's RFC evaluation, as well as the hypothetical questions posed to the VE - the Court will only address this issue and not the issues raised by Plaintiff with regard to credibility, the evaluation of Plaintiff's RFC or the adequacy of the hypothetical

---

[23] 20 CFR PT. 404, Subpt. P App.2 Rule 204.00.

questions posed to the VE. However, because the ALJ's finding that Plaintiff's mental depression was not severe is unrelated to the opinion of the treating physician - and therefore will be an issue at a subsequent hearing  - the Court will briefly address that issue as well.

A.    *The ALJ Failed To Articulate Adequate Reasons For Discrediting The Opinion of Dr. Grudem, Plaintiff's Treating Physician*

The Plaintiff contends that the ALJ erred by rejecting the opinions of Drs. Ugarte and Grudem - both of whom Plaintiff contends were treating physicians - and giving more weight to the opinions of the non-examining physicians. While the ALJ properly discounted the opinion of Dr. Ugarte, the Court concludes that the ALJ failed to articulate adequate reasons supported by substantial evidence for discounting the opinion of Dr. Grudem.

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[24]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[25]

The ALJ may discount a treating physician's opinion or report regarding an

---

[24] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."). See also Edwards, 937 F.2d at 583-584; Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[25] 20 C.F.R. § 404.1527(d)(2).

inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[26]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[27]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[28]  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[29]

Turning first to the opinion of Dr. Ugarte, the ALJ did not assign great weight to Dr. Ugarte's opinion in a May 2005 Medical Verification Form in which Dr. Ugarte stated that the Plaintiff was totally and permanently disabled due to chronic pain.  This was not error for several reasons.

Although Dr. Ugarte did actually see the Plaintiff, the Plaintiff was only seen by Dr. Ugarte on two occasions, March 4, 2004 and April 15, 2004. (R. 224-27, 241.) The Eleventh Circuit has recognized that a one-time examiner is not a treating source,

---

[26] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[27] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

[28] 20 C.F.R. § 404.1527(d).

[29] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

because there is no longitudinal or treatment relationship between physician and patient, as contemplated by the regulations.[30]  Thus, while Dr. Ugarte may be a treating source in a very general sense the fact that he only saw Plaintiff twice supports the ALJ's decision not to assign great weight to Dr. Ugarte's opinion

In addition to the fact that Dr. Ugarte only saw Plaintiff twice, the medical records from those visits do not contain any medical information supportive of Dr. Ugarte's conclusion that Plaintiff is disabled due to chronic pain. As aptly noted by the ALJ, Dr. Ugarte's notes of his examination of Plaintiff on April 15, 2004 (R. 241) do not contain any entries that suggest that Dr. Ugarte examined Plaintiff's back or provided any treatment for his back. The only opinion offered by Dr. Ugarte was on a Medical Verification Form, filled out on May 8, 2004 (R. 240), in which Dr. Ugarte checked a box that Plaintiff's condition did not permit work with restrictions.[31] Simply stated, Dr. Ugarte's opinion was not accompanied by any objective medical evidence suggesting treatment or examination and, therefore, was wholly conclusory.  Accordingly, the ALJ's decision to not assign great weight to the opinion of Dr. Ugarte was not error.

While the ALJ did not err by assigning little weight to the opinion of Dr. Ugarte, the ALJ erred by rejecting the opinion of Dr. Grudem. Dr. Grudem concluded that Plaintiff was disabled from even light and sedentary jobs and that Plaintiff was required to lie down frequently - a limitation if accepted would impact Plaintiff's ability to do either

---

[30] McSwain v. Bowen, 814 F.2d 617 (11th Cir. 1987); Gibson v. Heckler, 779 F.2d 619 (11th Cir. 1986.)

[31] See, Spencer o/b/o Spencer v. Heckler, 765 F. 2d 1090, 1094 (11th Cir. 1985)( rejecting an opinion from a non-examining physician who merely checked boxes on a form without providing any explanation of his conclusions.)

light or sedentary work.  While the ALJ did provide reasons for rejecting the opinion of

Dr. Grudem, a close examination of the record reveals that the reasons articulated by

the ALJ are not supported by substantial evidence.

One of the reasons offered by the ALJ for rejecting Dr. Grudem's opinion is that

Dr. Grudem only performed two physical examinations of Plaintiff and that Dr. Grudem's

opinions were based upon the Plaintiff's self-reported complaints.

A thorough examination of Dr. Grudem's medical records (R. 251-322), however,

suggests a much more detailed and lengthy history of treatment by Dr. Grudem.  The

Plaintiff was seen by Grudem and his staff at The Center for Spine & Pain Medicine

over the course of twenty months and during that lengthy time period the medical notes

evidence more than six occasions where Plaintiff was examined and/or treated by Dr.

Grudem.[32]

In addition to the fact that Dr. Grudem's records evidence examination and

treatment, the records also disclose that Dr. Grudem's opinions were based upon

diagnostic and clinical findings - and not as the ALJ stated - based solely upon the

subjective complaints of the Plaintiff. The ALJ apparently ignored the fact that Dr.

Grudem sent Plaintiff for an MRI on June 21, 2005 and that Dr. Grudem took these

results into account in reaching his conclusions. The MRI of Plaintiff's spine revealed:

(1)  a central disc herniation at T 3-4; (2) a small right paracentral disc herniation at T 5-

6; (3) a small right paracentral disc herniation with flattening of the ventral sac at T-6; (4)

a bulging annulus/osteophyte complex with a focal small right paracentral disc

---

[32] *See, e.g.,*  progress notes for 6/7/04, 6/22/04, 7/21/04, 5/9/05, 6/13/05 and 11/18/05.

herniation; (5) a bulging annulus/osteophyte complex flattening the ventral thecal sac; and (6) a ventral extradural defect at C 5-6, suggestive of a herniated disc or bulging annulus that would require a more dedicated MRI to specifically diagnose the problem. (R. 294.)

Notably, Dr. Grudem expressly stated in his July 25, 2005 medical opinion, that his opinion was confirmed with physical examinations, and was based upon the findings in the June 21, 2005 MRI scan. (R. 244.)  Consistent with the MRI Dr. Grudem found that Plaintiff had a "disc herniation neck C 5-6 and thoracic spine (multiple with cord intact)." Dr. Grudem also noted that the MRI was attached to the medical opinion. (R. 244.)  Therefore, contrary to the statement of the ALJ, Dr. Grudem's opinion was not based solely upon the subjective complaints of the Plaintiff but rather was based upon diagnostic testing and objective medical evidence.

Lastly, the ALJ rejected Dr. Grudem's opinion that Plaintiff must recline frequently because the ALJ found that there was no testimony from the Plaintiff that he needed to lie down and no evidence that the Plaintiff told any other doctor that he had to lie down frequently. A review of the record discloses that this conclusion by the ALJ is not supported by the evidence and is based upon a mischaracterization of the record. Contrary to the ALJ's statement the Plaintiff did testify during the hearing that with prolonged sitting his muscles tighten and that he must move around, recline or lie down to relieve the problem. (R. 351.)  Plaintiff also testified that on a normal day, he spends more than half of the day reclining or lying down..(R. 352.)  As such, this statement articulated by the ALJ for rejecting the opinion of Dr. Grudem is not supported by the record.

Accordingly, the Court concludes that for each of these reasons, the grounds offered by the ALJ for rejecting the opinion of Dr. Grudem - a treating physician whose opinions should have been accorded great weight - are not supported by substantial evidence and mandate that the decision of the ALJ be remanded for further proceedings so that the ALJ can evaluate the medical evidence properly and accord appropriate weight to the opinion of Dr. Grudem.

**B.**   ***The ALJ Did Not Err By Finding That Plaintiff's Depression Is Not A Severe Impairment***

Plaintiff contends that the ALJ failed to evaluate properly whether his depression was a severe mental impairment. The Court disagrees.

The ALJ concluded that Plaintiff's depression was not a severe impairment because the record discloses that the Plaintiff reported improvement when taking antidepressive medications and there was no evidence that he sought more intensive treatment for depression other than when he was referred by his primary doctor. Additionally, the ALJ noted that Plaintiff did not allege depression on his application for social security benefits and did not mention depression at the hearing.

Although, the ALJ incorrectly stated that Plaintiff had not alleged depression on his application for social security benefits,[33] the ALJ correctly noted that based upon the psychological evidence of record there was very little evidence of functional limitations from depression other than mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace.

---

[33] On section 9 of the disability application Plaintiff wrote that "not being able to do normal things have made me depressed." (R. 67.) Later in the application, Plaintiff wrote that his doctor had him on antidepressant medication but [that] he was still having trouble with pain and depression.

The record reflects that when the Plaintiff complained of depression in October 2002 he was given medication. One month after taking the medication the Plaintiff reported that he was almost back to normal. (R. 18.)

As the ALJ appropriately underscored in his decision, the only evidence of psychological or psychiatric treatment for depression sought by Plaintiff was the October 2005 psychological evaluation performed at the University of Florida. This treatment was sought by Plaintiff upon referral from his orthopaedic doctor because of pain, the use of pain medications and depression. While the psychological evaluation did note that the Plaintiff experienced depression the primary conclusion was that the Plaintiff had great difficulty employing adaptive behavioral pain coping techniques. The recommendation was that Plaintiff should attend individual psychotherapy sessions oriented at teaching the Plaintiff new ways of coping with pain and reducing his depressed mood. Notably, the evaluation does not include any information suggesting that the depression experienced by Plaintiff resulted in any severe functional limitations. Indeed, as the ALJ highlighted in her decision, the Plaintiff never followed through on the recommended treatment plan and simply failed to show up for appointments and did not respond to telephone and written inquiries. (R. 324.)  Conspicuously absent from the record, is any testimony or other evidence from the Plaintiff suggesting the reason for his failure to pursue the psychological treatment plan.

Accordingly, the record evidence supports the ALJ's conclusion that while Plaintiff did have symptoms of depression there was simply no evidence that Plaintiff

suffered any identifiable severe limitations from his depressive mood[34] and, therefore, the ALJ's conclusion that Plaintiff's restrictions from depression were only mild was supported by the evidence of record.

## V.  CONCLUSION

In view of the foregoing, the decision of the Commissioner is due to be **REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner, for an Administrative Law Judge to properly consider the opinions of Dr. Grudem as a treating source and to reevaluate Plaintiff's residual functional capacity in light of the opinions of Dr. Grudem and to conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter judgment accordingly, consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 20, 2008.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:  Counsel of Record

---

[34] The ALJ's conclusion is further supported by the consultative examination performed by Gary Honickman, Ph.D., who found that Plaintiff suffered from a pain disorder associated with general medical condition and psychological factors. (R. 172.)